# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES ELLIOTT and | ) | |
| TERESA GUILER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLARKSVILLE, CHIEF MARK | ) | No. 3:05-0138 |
| SMITH, AGENT DONNIE ROBBINS, | ) | JUDGE ECHOLS |
| SERGEANT DONALD GIPSON, OFFICER | ) | |
| BRET NORFLEET, AGENT FRED | ) | |
| MCCLINTOCK, AGENT JAMISON WIROLL, | ) | |
| AGENT DAVID O'DELL, SERGEANT | ) | |
| BERT CLINARD, DETECTIVE TY | ) | |
| BURDINE, OFFICER JIM KNOLL, | ) | |
| SERGEANT DAVID CROCKARELL, | ) | |
| SERGEANT JAMES SMITH, SERGEANT | ) | |
| JOHNNY FERGUSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the Court are three motions for summary judgment: Plaintiff's Motion For Partial Summary Judgment (Docket Entry No. 98); Individual Defendants' Motion For Summary Judgment (Docket Entry No. 103); and Defendants City of Clarksville and Chief Mark Smith's Motion For Summary Judgment (Docket Entry No. 106). The parties have filed responses and replies to each of these motions. The parties have also filed supplemental memoranda concerning expert testimony. Also pending is Defendants' Motion to Strike (Docket Entry No. 119), to which the Plaintiffs have filed a response.

This is a civil rights case Plaintiffs brought against numerous defendants pursuant to 42 U.S.C. § 1983 alleging constitutional claims for illegal search and seizure, excessive force, and

1

violations of policy.  Plaintiffs also alleged state-law claims for assault and battery.  Most of the facts are undisputed, but those which are disputed are taken in the light most favorable to the Plaintiffs.

# I. <u>FACTS</u>

On September 7, 2004, Clarksville Police Department Agent Donnie Robbins ("Robbins") received information from a citizen informant that the informant had been at the home of Jeremiah Taylor ("Taylor") approximately four to five days earlier and had observed several plastic bags of a powdery substance hidden in a fire safe and in a diversion safe.  Taylor, who was living at 343-B Old Trenton Road, had advised the citizen informant that the powdery substance was methamphetamine.  Taylor was described as an individual in his twenties.

The citizen informant was not involved in general criminal conduct and went to the Clarksville Police Department to report drug activity for reasons unrelated to any hope of reward or favor.  The informant did not seek or receive remuneration or reward from the Clarksville Police Department, other than a promise of confidentiality.

The informant met with one officer, disclosed his information about Taylor, and was referred to Robbins, who did not meet personally with the informant.  Robbins had not previously met or talked with this citizen informant.  Robbins advised the informant by telephone that the information was not "fresh enough" to be acted upon.  Robbins asked the informant to update the information he had provided if he were in the home of Taylor again, and to provide the address for Taylor where he had seen the activity.

Two days later, on Thursday, September 9, 2004,  the citizen informant contacted Robbins by telephone to advise that he had been to Taylor's home that evening and had again observed the

2

substance Taylor represented to be methamphetamine. The informant returned to the home of Taylor to be sure of the address and reported it to Robbins as 343-B Old Trenton Road. The informant further described the house to Robbins as the "white house behind the white house."[1] The informant did not describe the house further and was not asked for additional information about it. The informant had no knowledge as to who lived in the other houses in the area. The informant does not recall being asked by any Clarksville Police Officers to take them to the area, but would have been reluctant to do so for fear of being seen by Taylor in the company of a police officer.

Robbins confirmed that the citizen informant did not have any criminal history and was employed. Robbins located a county arrest report that listed Taylor's address as 343-B Old Trenton Road. The informant advised that Taylor had previously been arrested in Nashville for possession of methamphetamine for resale, and Robbins corroborated that information through an NCIC criminal history check. Robbins also reviewed electric service records to confirm Taylor's address at 343-B Old Trenton Road.

That same evening, Robbins went to the address given by the informant, but was unable to locate the home due to darkness. The next day, Friday, September 10, 2004, Robbins gave patrol officer Bret Norfleet ("Norfleet") a sheet of paper with the 343-B Old Trenton Road address on it and told Norfleet to locate the address. Norfleet drove a marked patrol car and had never before performed reconnaissance. He drove to Old Trenton Road, saw a mailbox with the number 343, and located a house with a "B" on it. Norfleet assumed that was the house Robbins was looking for.

---

[1]Although the Defendants in their supplemental filings try to generate a factual dispute about whether Robbins recalled this description given by the informant, the parties stipulated for purposes of summary judgment that this was the description the informant provided to Robbins. (Docket Entry No. 11-2 ¶ 7.)

(Docket Entry No. 114-15, Norfleet Depo. at 21-22, 24.)  Norfleet did not "stop in the middle of the road or pull out binoculars to get a closer look or anything like that."  (Id. at 29.)  Norfleet then called Robbins and asked, "What do you need?"  Robbins advised Norfleet to get the best description possible of the house.  Norfleet observed two structures in the general area, but he did not see an address on either structure.  In front of the house marked with a "B" Norfleet observed a car, but he could not see the license plate on the car.  Norfleet later gave Robbins a description of what he had seen; Robbins testified Norfleet's description was a brown house on the right-hand side of the road.  (Docket Entry No. 111-1, Robbins Depo. at 86.)  Norfleet advised Robbins that he could not "swear to you that this is the house."  Robbins told Norfleet that he would "check it out."

After obtaining Norfleet's observations, later on the afternoon of September 10 while it was still daylight Robbins drove to the location to view the property independently.  As Robbins drove by the property he saw a group of mailboxes.  One mailbox had 343 on it.  Robbins did not see a mailbox that said 341.  The mailboxes were in front of a structure with the letter "B" at the side of the door.  When Robbins saw the group of mailboxes in front of the structure, he assumed that structure was a duplex or an older house that had been made into apartments.  He assumed the property was 343 and "it was A, B, C, D, and E."  (Robbins Depo. at 91.)  Robbins believed that the structure marked with the letter "B" was in fact 343-B Old Trenton Road, the location given by the informant.[2]  Robbins, who is color blind, thought the house was a brown vinyl-sided structure with

---

[2]Defendants assert that Robbins believed he was observing an apartment complex made up of several structures, and Plaintiffs dispute this pointing out that Robbins knew or should have known that the structure he observed was not an apartment complex.  Although Robbins first claimed in his deposition that he believed the structure was an apartment complex, he later admitted that he saw a separate structure to the left of Plaintiffs' residence clearly marked 343A and then stated that an apartment complex does not necessarily mean that all occupants of the complex were residing under one roof.

4

brown shutters and a brown roof with a carport and a "B" on the left side of the front door. (Id. at 86-87.) Robbins knew there was a white house, marked 343-A on the front, which sat approximately 100 feet to the left of the structure which had only a "B" near the door. (Id. at 99, 105.) Robbins also testified at his deposition, however, that he assumed that 343-A was on the right-hand side of the house marked "B." (Id. at 92.) If Robbins were to describe the location today, he would characterize the area as a subdivided lot with separate residences. (Id. at 104.) Robbins obtained mileage and a general description of the residence marked "B" and returned to the office.

Taylor's residence at 343-B Old Trenton Road is a white house behind the white house marked 343-A. Taking the available photographs in the light most favorable to Plaintiffs, 343-B is visible from the street, and it is clearly marked with the house number "343B" at the front door.

Although there is some dispute in the record as to what happened next, it appears that, at the direction of Sgt. Bert Clinard ("Clinard"), Robbins asked Jamison Wiroll ("Wiroll") and Fred McClintock ("McClintock") to go back out to the location and obtain the colors of the house, obtain another description of the house, and look at the structure for any house number. Robbins wanted Wiroll and McClintock to obtain the colors of the house because of Robbins' color-blindness. Also, Robbins was alone when he first observed the property and he tried to write a description and look at the property at the same time. He wanted to ensure that he had not missed anything. Robbins did not ask them to look around to see if any other residence might be 343-B. (Docket Entry No. 114-17, Robbins Depo. at 118.)

_____

For purposes of summary judgment, the Court accepts as true that Robbins saw a separate structure to the left of Plaintiffs' residence clearly marked as 343A. Further, as will be discussed in greater detail below, the layout of the buildings as shown in photographs presented to the Court should have prompted Robbins to investigate further. (Docket Entry Nos. 112, Exs. & 114-4.)

5

Wiroll and McClintock testified Robbins told them to go to the address, locate the residence with a "B" by the door and find out if a number was written somewhere on that building. Wiroll and McClintock drove to the property together during daylight. They drove past the property at approximately 35 to 40 miles per hour. Wiroll observed several mailboxes in front of the building with the "B" next to the door, but he could not read the numbers on the mailboxes, and he could not locate any numbers on the structure. They parked across the street in a yard and Wiroll used binoculars to observe the residence, but he could not find a number on it. (Docket Entry No. 104-4, Wiroll Depo. at 43.) They commented to each other that there were outbuildings or other structures behind the residence. (McClintock Depo. at 60-61.) Wiroll asked McClintock if "this is it." McClintock responded that this was the house that had been described, "so just start telling me what you see." (Wiroll Depo. at 43.) Wiroll and McClintock then obtained all the descriptors they could for the building with a "B" by the door.

Back at the police department they reported to Robbins that the structure with a "B" was tan with maroon shutters and a maroon-shingled roof. Wiroll drew the scene to convince Robbins to change the colors he planned to use to describe the residence in his warrant and affidavit.[3] (Docket Entry No. 114-20, Wiroll Depo. at 102.) Based on their observations of the property, Wiroll and McClintock believed it was possible that the structure in question was divided up in some way.

Clinard testified that Robbins passed along to Clinard "whatever the [informant] told him." Clinard knew that Robbins corroborated what the informant said, but that Robbins did not investigate drug dealing further through use of controlled drug buys or other techniques. (Docket

_____

[3]The record does not reflect what colors Robbins had typed in his search warrant and affidavit originally, but as stated earlier, Robbins testified he thought the house was brown with brown shutters and a brown roof.

Entry No. 114-9, Clinard Depo. at 45.)  Clinard agreed Robbins had enough information to apply

for a search warrant. (Id. at 44.)

Robbins drafted a search warrant and an affidavit in support of the search warrant.  Robbins

did not include in his affidavit that the informant identified Taylor's house as "the white house

behind the white house."  The search warrant stated:

> YOU ARE THEREFORE COMMANDED to make an immediate search on
> the person or premises of Jeremiah Taylor and 343-B Old Trenton Road and in the
> premises used and occupied by them located and more particularly described as
> follows:  From the intersection of Old Trenton Road and Welchwood Drive travel
> in an easterly direction on Old Trenton Road for approximately one tenth of a mile
> to the first structure on the right side of the roadway.  The residence to be searched
> is an apartment complex containing five apartments.  The apartment complex has tan
> siding with maroon shutters and a maroon-shingled roof.  The residence to be
> searched has the letter B on the right side of the front door.  The numbers 343 appear
> on a mailbox located in front of the structure.  The residence to be searched is 343-B
> Old Trenton Road.

(Docket Entry No. 100, Dyer Aff., Ex. A.)   Robbins testified that he did not intentionally

misrepresent any information in the search warrant.  (Robbins Depo. at 95.)  Clinard reviewed the

search warrant application and approved it.  (Clinard Depo. at 51.)  Robbins presented the search

warrant and affidavit to General Sessions Judge Ray Grimes, who signed the search warrant at 5:20

p.m. on September 10, 2004.  Robbins admitted at his deposition that he did not have a warrant for

341-B Old Trenton Road and he had no basis to obtain a search warrant for that address.  (Id. at

119.)

The Clarksville Police Department considers drug search warrants to be high risk warrants

based on the nature of the crime and the potential for weapon involvement.  Thus, the Clarksville

Police Department TACT Team serves all drug search warrants.  It is the TACT Team's job to enter

and secure the residence identified in the warrant and then turn the residence over to the drug agents for a search.

Once the TACT Team is activated to serve a search warrant, planning is conducted. A member of the TACT Team is taken to the address by the search warrant affiant or an agent with personal knowledge. The "prewarrant drive-by" is to allow a member of the TACT Team to view the property where the warrant will be served so that the Team is not blindsided by any obstacles, such as dogs or fences, that might get in the Team's way of approaching the property. The TACT Team ordinarily does not independently confirm the address to be searched. The TACT Team relies on the information contained in the warrant as to the correct address and the description of the premises. The Team relies upon a copy of the judge-signed search warrant and the fact that a member of the Team is taken to the target by someone with personal knowledge of the location.

Wiroll drove Sgt. Donald Gipson[4] ("Gipson"), the TACT Team Commander, to the property for "prewarrant planning" during daylight. While en route, Wiroll told Gipson that he "wasn't comfortable with the way things were going that day." (Docket Entry Nos. 111-10 & 114-11, Gipson Depo. at 67.) Wiroll thought the investigation was "going fast," but he did not give any specifics. Wiroll "just had a gut feeling that he thought something was going on or something felt funny about the day." (Id. at 68, 75.) Gipson later reported that "it didn't give him warm fuzzies about the warrant." (Id. at 75.)

Gipson "went out and looked at the location they showed me." (Id. at 66.) Wiroll took Gipson to the exact spot from which he and McClintock had observed the house marked "B." Gipson looked through binoculars from the same vantage point Wiroll had had earlier. (Wiroll

_____

[4]Sergeant Gipson was subsequently promoted to Lieutenant.

8

Depo. at 51.)  Gipson made a sketch, but he did not pay any attention to the structures surrounding the house marked "B."  (Gipson Depo. at 81.)

 Gipson called Robbins and gave him a description of the house and Robbins confirmed Gipson was observing the correct location.  Gipson asked if the carport was included in the warrant.  Robbins said no.  Gipson asked, "But there is a carport? [Robbins] says yes.  That's the location." (Id. at 69.)  Gipson did not have any concern that the carport was not mentioned in the search warrant because "[e]verything else matched."  (Id.)

Gipson did not see the search warrant itself until after he returned from his trip to the property.  When Gipson read the search warrant, he understood it to mean that the structure marked "B" contained five separate apartments.  Gipson has seen instances where several apartments are "crammed into pretty small places."  (Docket Entry No. 104-9, Gipson Depo. at 80.)  Prior to departing headquarters, the TACT Team was briefed that they were going to execute a drug search warrant; therefore the Team members believed they were entering a high-risk situation.

The TACT Team was preparing for execution of the search warrant when Robbins asked officer David O'Dell ("O'Dell") to perform "prewarrant surveillance" to see if anyone came or went from the premises, which Robbins described to O'Dell as having off-white vinyl siding.  (Docket Entry No. 114-16, O'Dell Depo. at 52.)  O'Dell was not involved in any way with the reconnaissance to get information for the search warrant.  O'Dell is not a member of the TACT Team.  Robbins gave O'Dell the address and directed him to the house marked with "B."  O'Dell was aware that "[a] lot of houses in Clarksville, unfortunately, don't have the proper numbers on them."  (Id. at 46.)  O'Dell testified that, "based on what I saw of the mailboxes and what I saw above the door and the awning and the little carport and the color of the siding, the off-white siding,

9

that's when I asked [Robbins] if that was the house. And he said yes." (Id. at 52-53.) O'Dell did not know any of the information the informant supplied to Robbins, and he was not directed to obtain any descriptive information about the house. (Id. at 53.) Robbins gave O'Dell the description of a car to look for at the residence. O'Dell saw a car that was different from that described by Robbins. Due to the angle the car was parked and the wood line running along the right side of the property, O'Dell was unable to see the license plate. (Id. at 53, 56-57.)

O'Dell drove past the property described in the search warrant approximately 10 to 15 times prior to the TACT Team's arrival. He knew there were four or five mailboxes that were marked 341 and 343, but he was not sure he even saw them until he parked his car and approached the residence to assist in the execution of the warrant. (Id. at 56-57.) O'Dell did not notice the white residence marked 343-B due to the approach of darkness and its position behind another house. (Id. at 71.)

Once the TACT Team arrived at the property, O'Dell and other officers with the Major Crimes Unit secured the perimeter of the residence while the TACT Team executed the warrant. All members of the TACT team were wearing standard issue black battle dress uniforms, black hoods covering their heads and faces, black helmets and goggles. Each wore a black vest with white police markings on the front and back. Each carried a 9mm sub-machine gun with a laser sight in addition to a service pistol.

Gipson executed the knock and announce for the execution of the warrant. Gipson banged on the door and announced, "police search warrant, demand entry" three times. Gipson waited several seconds between each of the three knock and announce attempts. When no one inside the home responded to the knock and announce, the door was forcefully opened using a ram.

10

James Elliott ("Elliott"), 54, is deaf and wears bilateral ear implants. Elliott underwent a liver transplant in June or July 2004. On the evening in question, Elliott had removed his implants while watching a football game on television. Elliott was lying on the couch in the living room when he felt a vibration. Teresa Guiler, 54, a friend who lived in the home and was assisting Elliott during his recovery from the transplant, was watching television in another room. Her right arm was in a sling due to a collarbone fracture. Elliott asked Guiler if she heard anything, and she responded that she had heard a noise and felt a vibration. As Guiler walked to the door she heard voices. As she reached for the door handle with her left hand, the door opened and her left hand was hit. (Docket Entry No. 104-16, Guiler Depo. at 69.)

In Gipson's experience, it is not unusual that people are in a house that do not belong there, especially when narcotics are concerned. Individuals in a residence who do not match the description of the suspect are detained.

Wiroll, as "point man" for the TACT Team, was the first person to enter the residence after the officer carrying a shield stepped aside. (Wiroll Depo. at 99.) Wiroll's job was to ensure there were no threats and to secure the room. Wiroll testified that "speed is of the essence and safety is the main concern."

As the door opened, the first thing Wiroll saw was Guiler standing in front of him. The basic policy for TACT Team members on the execution of a drug search warrant is that "generally" everyone goes to the ground because that is safest. Wiroll pointed his automatic weapon at Guiler and gave her commands to get down on the ground. Wiroll repeated, "Police, get on the ground." Guiler did not react to the commands. Wiroll could see Elliott standing behind Guiler, but could not see Elliott's hands. Wiroll then grabbed Guiler about the mid-arm and guided her to the right, out

11

of the way, while still giving her commands to get down. Guiler then started to comply. Wiroll guided Guiler to the floor to ensure that she did not fall on her face. Guiler was not flexicuffed,[5] nor was she physically searched.

Guiler does not have any independent recollection of how she got to the floor. Guiler cannot remember any threatening remarks made to her by police officers. She does not remember any officers stating they were going to shoot her or kill her. No individual kicked, stomped, or hit her. She does recall a large gun was pointed at her face because she remembered the red light on the laser sight.

As soon as Wiroll made contact with Guiler, the number two person in the stack of TACT Team officers, Charles Burdine, engaged Elliott, who was standing in the back part of the room in another doorway. As Burdine entered, he saw Elliott standing with a black object in his right hand.

Burdine ordered Elliott to "get on the ground, get on the ground, get on the ground." Eventually, Elliott went to his knees and then to his stomach with his arms out to the sides toward his head. At this point the rest of the TACT Team entered the residence, and Burdine yelled a command for cover while he handcuffed Elliott.

Jim Knoll entered the residence after Burdine. As Knoll entered he saw Burdine across the room with Elliott on the ground. Knoll went over to Burdine, knelt beside Elliott and attempted to take Elliott's left arm to pull it behind to be cuffed. Elliott resisted Knoll's efforts. Elliott testified that when the TACT Team attempted to place him in flexicuffs he tried to "hold back a little" and "was not volunteering to do it, that is for sure." (Elliott Depo. at 37.) Eventually Knoll was able to put Elliott's left hand behind his back. Burdine took Elliott's other arm and brought it behind

---

[5]Flexicuffs are plastic and work like a pull tie.

Elliott's back and Elliott was then flexicuffed. Elliott testified that, once he was cuffed, they "picked [him] up like a suitcase, while another officer had [him] twisted like this (indicating), and frisking me, you know, all the way down." Elliott was wearing only gym shorts. (Elliott Depo. at 43.) Elliott testified he was grabbed by his wrists and lifted up about waist high, and he was hurting. (Id. at 44-45.) After the frisk, the officers "slammed [him] back down." (Id. at 44.) Knoll did not have any specific reason to believe that Elliott was armed. (Knoll Depo. at 58.)

Guiler was on the floor near a couch, rocking chair and coffee table. As Guiler rolled from one side to the other, Wiroll realized that her arm was in a sling. Guiler asked what was going on and Wiroll advised her that she was safe, to relax, and that everything was going to be fine. Wiroll continued to listen as the rest of the TACT Team proceeded through the house. Wiroll heard the repeated commands to Elliott and believed that Elliott was not complying with the commands.

Guiler could see a number of officers around Elliott and she heard Elliott say, "quit kicking me, quit kicking me." (Docket Entry No. 104-16, Guiler Depo. at 66.) She could see an officer pushing Elliott's head when he tried to turn it, and she saw officers lift him up. (Id. at 66-67.) Guiler then advised Wiroll that Elliott is deaf. Wiroll turned to Gipson in the front doorway and stated, "He's deaf," and then Wiroll turned in the direction of the other Team members who were with Elliott and yelled, "He's deaf." Soon thereafter the commotion surrounding Elliott stopped.

Guiler recalled the TACT Team tried to get Elliott to be still. She remembers the TACT Team members called Elliott "Mr. Taylor." Guiler does not remember any threatening statements that were made to Elliott. Guiler did not see anyone kick, punch or slap Elliott. Guiler does not remember any officer telling Elliott "don't move or we'll kill you."

13

Elliott testified that he was able to ask what was happening only once before he was placed on the ground, and the TACT Team flexicuffed him within thirty seconds to a minute after they placed him on the ground. Elliott stated he was not kicked in the ribs or kicked in the face, but the officers kicked his feet apart a couple of times in an effort to keep his legs spread. When Elliott turned his head, an officer would push his head back. (Elliott Depo. at 43, 45.) An officer's knee was placed in Elliott's back while he was being flexicuffed.[6] At least one submachine gun was pointed at him.

At some point Burdine heard Wiroll yell that Elliott could not hear. By that time there were no more commands to give Elliott because he was already on the ground and being cuffed. Once Elliott was cuffed, Burdine did not have any more dealings with Elliott.

By the time Lt. James Smith ("Smith") entered the house, Guiler and Elliott were already detained. Smith entered the home and "cleared" a bedroom and a bathroom next to it. Once he finished clearing the rooms, Smith stood waiting for the order to withdraw.

Johnny Ferguson ("Ferguson") entered the house, moved to an area where he would not be in the way and directed officers to go left or right as they entered the house. By the time he entered the home, Guiler had already been detained and he had no involvement in cuffing Elliott.

As David Crockarell ("Crockarell") entered the home, he saw Guiler on the right and kept on going through the house. He next saw Elliott lying on the ground as the officers were attempting to cuff him. Crockarell continued to walk past Elliott. Later, he came back and helped Elliott to his feet.

---

[6]Officer Knoll denied that he placed a knee in Elliott's back. (Docket Entry No. 104-14, Knoll Depo. at 53.)

14

Gipson was the last member of the TACT Team to enter the home and by that time, the entire house had been checked. When Gipson first saw Guiler she was seated on the floor and an officer was with her. Elliott was lying on the floor and had been flexicuffed.

Robbins entered the home after the TACT Team secured the residence. Robbins observed Elliott and determined that Elliott did not fit the general description of Taylor. Robbins and Crockarell assisted Elliott to his feet and brought him into the living room. Elliott testified that when he was picked up one person had his hands and one person had his shoulders. (Elliott Depo. at 45-47.) This is consistent with the TACT Team's manner of helping handcuffed persons to their feet. After Elliott was picked up from the floor, Wiroll helped Guiler into a rocking chair while Elliott was brought to a couch in the same room. At this point, Robbins believed that Elliott was perhaps buying drugs from Taylor. As Robbins walked Elliott to the living room Robbins asked Elliott who he was, but Elliott could not understand or respond to the questions. Robbins asked Guiler her name and address and realized for the first time that they were in the wrong residence. Robbins sent O'Dell to get cutters to remove the flexicuffs from Elliott. Approximately two minutes later, O'Dell returned with the cutters. In the meantime, an officer and Guiler assisted Elliott in putting on his ear implants. (Elliott Depo. at 53.)

Sgt. Clinard and members of the Major Crimes Unit were stationed in an area around the perimeter of the house. (Docket Entry No. 104-10, Clinard Depo. at 63.) When Clinard moved from the front yard to the back corner of the property, he realized there was another residence behind the one marked 343-A next door to Elliott's residence. (Id.) Clinard did not enter Elliott's home until thirty to forty-five seconds after the TACT Team entered and secured the residence. Both occupants were detained, and Clinard focused on Guiler. He asked her if anyone else lived in the home, if

15

Jeremiah Taylor lived in the home, and the address of the home. After speaking with Guiler, Clinard quickly ordered removal of Elliott's flexicuffs. Clinard informed his lieutenant the officers were at the wrong house, and Clinard instructed his personnel on the perimeter to find 343-B for fear that the officers' safety had been compromised. (Id. at 65.)

The TACT Team cleared 341-B, including the attic, within thirty to forty-five seconds. The Team left between the time Elliott was brought to his feet and when he was seated in the living room. Agent Robbins and the Major Crimes Unit assumed control of the residence after the TACT Team left. The TACT Team members were not aware that they had entered the incorrect residence until they were in a van returning to police headquarters. In Gipson's eight years of experience on the TACT Team, the Team had never before entered the wrong house.

Guiler testified that a couple of officers stayed in the home to apologize, they called emergency medical technicians to assist Elliott and Guiler, they encouraged Elliott and Guiler to go to the hospital, and they discussed repairing the door. The time between the execution of the search warrant and the time Robbins left the home was no more than five or six minutes. Guiler did not see the officers conduct any search of the premises after Elliott's flexicuffs were removed. Guiler's impression was that the officers had made a mistake in entering 341-B Old Trenton Road. Elliott had no information that the officers intentionally entered the wrong house.

Within minutes of discovering that the wrong house had been entered, Robbins located the residence for which the search warrant was intended, 343-B Old Trenton Road, next door to 341-B Old Trenton Road and behind 343-A. The white residence was clearly marked 343-B at the entrance door. That same night, Robbins obtained a search warrant for 343-B Old Trenton Road, which described the white residence. (Wiroll Depo. at 92.) The warrant was executed, resulting in

16

Jeremiah Taylor's arrest. Charges against Taylor were later dismissed after the state judge ruled the search warrant lacked probable cause and suppressed all of the evidence seized.

## II. <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

17

# III. ANALYSIS

To prove a violation of 42 U.S.C. § 1983, Plaintiffs must establish that a person acting under color of state law deprived them of a right secured by the Constitution or the laws of the United States. Sample v. Bailey, 409 F.3d 689, 695 (6th Cir. 2005).

## A. The search warrant and its execution

### 1. Validity of the warrant

Plaintiffs' motion for partial summary judgment addresses the sole question whether the search warrant was valid. Plaintiffs contend the search warrant was constitutionally invalid because it did not describe the residence intended to be searched and there was no probable cause to enter Plaintiffs' residence. Defendants contend the search warrant was valid and authorized the search of Plaintiffs' residence at 341-B Old Trenton Road.

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Defendants cannot make a plausible argument that there was probable cause to enter the Plaintiffs' home. See United States v. Coffee, 434 F.3d 887, 892 (6th Cir. 2006) (observing search warrant may issue only when judge "can conclude from the totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."); United States v. Finch, 998 F.2d 349, 352 (6th Cir. 1993) (probable cause arises from affidavit which sets out facts indicating fair probability that evidence of a crime will be located

on premises).[7]  Therefore, the analysis here turns on the particularity requirement of the Fourth Amendment.

A search warrant sufficiently particularizes the place to be searched if the officers "can with reasonable effort ascertain and identify the place intended." <u>Steele v. United States</u>, 267 U.S. 498, 503 (1925); <u>United States v. Gahagan</u>, 865 F.2d 1490, 1496 (6th Cir. 1989).  A two-part test applies: (1) whether the place to be searched is described with sufficient particularity to enable the executing officers to locate and identify the premises to be searched with reasonable effort and (2) whether there is a reasonable probability that some other premises might be searched by mistake.  <u>United States v. Durk</u>, 149 F.3d 464, 465 (6th Cir. 1998); <u>Gahagan</u>, 865 F.2d at 1496-1497.

The search warrant at issue fails both parts of this test.  First, even though the warrant stated the correct address intended to be searched, the warrant did not come close to describing Jeremiah Taylor's residence at 343-B Old Trenton Road.  The citizen informant told Robbins that Taylor's home was the "white house behind the white house," but Robbins did not disclose this to the judge. In contrast, the search warrant described "an apartment complex containing five apartments.  The apartment complex has tan siding with maroon shutters and a maroon-shingled roof.  The residence to be searched has the letter B on the right side of the front door.  The numbers 343 appear on a mailbox located in front of the structure."

_____

[7]The Court need not consider the parties' probable cause arguments which are based on the state court's ultimate ruling that even the second warrant for Taylor's residence lacked probable cause.  (Docket Entry No. 99, Plaintiffs' Memorandum at 3 n.1; Docket Entry No. 113, Defendants' Memorandum at 13-15.)  The evidence is undisputed that there was no probable cause to believe that Elliott or Guiler had committed any crime.

This description included in the search warrant did not enable the judge to make a fully informed decision and it did not allow the executing officers to locate and identify with reasonable effort the premises Robbins intended to be searched. Further, based on the inaccurate description in the search warrant, there was a reasonable probability that another residence would be searched by mistake, and, in fact, an erroneous search of the Plaintiffs' residence occurred.

Defendants rely on United States v. Durham, 148 Fed.Appx. 320 (6th Cir. 2005), United States v. Pelayo-Landero, 285 F.3d 491, 496-497 (6th Cir. 2002), and Durk, 149 F.3d at 466, but these cases do not apply to the facts of the instant case. In Durham, 148 Fed.Appx. at 325, the Sixth Circuit upheld denial of a motion to suppress evidence where the search warrant accurately described the trailer officers intended to search and which was, in fact, searched, even though the search warrant stated "993 Dry Branch Rd." instead of the correct address, "995 Dry Branch Rd." In Pelayo-Landero, 285 F.3d at 495, the Sixth Circuit upheld denial of a motion to suppress evidence where the street address of the place intended to be searched appeared to be wrong, but the district court found that "[t]he subject trailer matched [the] description perfectly. . . . Anyone given a copy of this description, would have found and identified the subject trailer with ease." Likewise, in Durk, 149 F.3d at 465-466, the search warrant contained two descriptive errors: a transposition in the house number and the statement that the house was located "3 houses to the east of Grandview" when in fact the house was three houses to the west of Grandview. The Sixth Circuit reversed a suppression order, holding that the search warrant accurately described the residence intended to be searched and gave rise to no reasonable probability that another house would be searched by mistake. Id. at 466.

20

In each of these cases, the search warrants accurately described the places the officers intended to and did search, but the search warrants contained technical errors. Here, Robbins' search warrant did not accurately describe Taylor's white house at 343-B Old Trenton Road. The warrant described a completely different residence which was searched in error. Thus, Durham, Pelayo-Landero, and Durk do not provide any support for Defendants' position that they obtained a valid search warrant.

Defendants also rely on Maryland v. Garrison, 480 U.S. 79, 85 (1987), and Pierre v. Neudigate, 101 Fed.Appx. 50, 54 (6th Cir. 2004), to contend that they took reasonable steps to obtain an accurate description of the premises to be searched. In Garrison police officers obtained a search warrant for an apartment they intended to search, but during execution of the warrant, they inadvertently entered a second apartment of which they were not previously aware. Garrison, 480 U.S. at 80. The Supreme Court noted there was no claim in the case that the place to be searched was inadequately described or that probable cause was lacking.[8] Id. at 85. The only error in the Garrison search warrant was that its description was "broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building at 2036 Park Avenue." Id. The Supreme Court defined the issue as "whether that factual mistake invalidated a warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan." Id.

The Court in Garrison upheld the validity of the search warrant, holding that "the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." Id. The constitutionality of the officers' conduct was assessed "in light of the

[8]By contrast, both claims are raised here.

21

information available to them at the time they acted." Id. The Court concluded that the officers acted reasonably in taking steps to identify the third floor apartment as the home of their target and that "the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." Id. at 88.

In Neudigate, 101 Fed.Appx. at 51, a confidential informant provided information to police that a target's residence was a single family dwelling. Police conducted surveillance at the address and took other steps to verify the informant's information. Nothing in their investigation led them to think the building was a multi-family dwelling. Police obtained a search warrant for "29 Mulberry Street" under the mistaken impression that the building was a single residence dwelling. Id. at 52. During execution of the warrant, officers inadvertently entered an apartment that was not the residence of the target. Id. The Sixth Circuit relied on Garrison to uphold the search and affirmed a grant of summary judgment to defendant police officers in that section 1983 case. Id. at 51, 53-56.

Here, the search warrant Robbins obtained was not overbroad, as in Garrison and Neudigate. The TACT Team did not, for example, mistakenly enter apartment "A" when Robbins intended for them to search only "B." Instead, the search warrant was entirely erroneous because it did not describe with particularity the place intended to be searched. Thus, Garrison and Neudigate do not apply to these facts to lend any support to Defendants' contentions.

The actions of these police officers were not reasonable as a matter of law. See Neudigate, 101 Fed.Appx. at 53 (noting where facts are not in dispute as to what defendants did or saw, reasonableness of police actions in obtaining warrant is question of law). Each officer was under a duty to discover relevant information describing the target residence and to present such

22

information to the judge asked to sign the search warrant.  <u>See</u> <u>Garrison</u>, 480 U.S. at 85.  The search

warrant Robbins obtained was not a valid warrant because it failed to inform the judge of the

informant's description and it failed to satisfy the particularity requirement of the Fourth

Amendment.  <u>See</u> <u>Knott v. Sullivan</u>, 418 F.3d 561, 567 (6th Cir. 2005) ("We conclude . . . that the

defects in the warrant executed by the Defendants are so grave that the Defendants are not entitled

to summary judgment on the grounds that the search was conducted pursuant to a valid warrant.")

    *2.  Qualified immunity in obtaining the search warrant*

In response to Plaintiffs' motion for partial summary judgment and in support of their own

motion for summary judgment, the Defendants involved in procuring the search warrant and

preparing for the search itself contend that they are entitled to qualified immunity for their actions.

"Qualified immunity shields government officials acting within the scope of their official duties

from civil liability insofar as their conduct does not violate clearly established rights of which a

reasonable person would have known."  <u>Vakilian v. Shaw</u>, 335 F.3d 509, 516 (6th Cir. 2003).

Application of qualified immunity involves a two-step inquiry.  First, taken in the light most

favorable to Plaintiffs, the Court must decide whether the facts alleged show the officers' conduct

violated a constitutional right.  <u>Id.</u>  If violation of a constitutional right is established, the Court must

next ask whether that right was clearly established.  <u>Id.</u> at 516-517.  Here the officers violated

Plaintiff's clearly established Fourth Amendment rights to be free from illegal search and seizure.

In a civil rights case, an investigator is entitled to rely on a judicially-secured search warrant

as satisfactory evidence of probable cause, but not if that officer knowingly makes false statements

and omissions to the judge or acts with reckless disregard for the truth such that, but for the falsities

or omissions, the judge would not have issued the warrant.  <u>Id.</u> at 517; <u>United States v. Atkin</u>, 107

F.3d 1213, 1217 (6th Cir. 1997).  An officer may be held liable under § 1983 for acting with reckless

disregard for the truth in obtaining a warrant.  <u>Vakilian</u>, 335 F.3d at 517.  "To overcome an officer's

entitlement to qualified immunity, however, a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." Id. Resolution of this probable cause issue within the context of qualified immunity is a question of law for the Court. Id.

Plaintiffs allege that Robbins committed a fraud on the state court judge, but Robbins testified at his deposition that he did not intentionally provide false information or omit relevant information when presenting the search warrant application to the state court. Taking all of the record evidence in the light most favorable to Plaintiffs, however, the Plaintiffs have made a substantial showing that Robbins acted with at least reckless disregard for the truth and that the allegedly false or omitted information about the informant's description as compared to the actual description given in the search warrant was material to the finding of probable cause. See Vakilian, 335 F.3d at 517. A jury could determine on this record that Robbins acted unreasonably when his conduct is viewed objectively. A jury could find that Robbins' actions amounted to something far more than negligence or gross negligence, as Defendants contend. Under these facts, a jury could determine that Robbins acted so unreasonably that his actions amounted to at least reckless disregard for the truth. See Malley v. Briggs, 475 U.S. 335, 344 (1986) (holding knowing or reckless false statement by law enforcement officer to judge in seeking search warrant disqualifies officer from protection of qualified immunity).

Robbins and Norfleet, upon whom Robbins depended to some extent, saw the number 343 on a mailbox and a residence behind the mailbox with a "B" at the door. Both of them assumed that they had located 343-B Old Trenton Road without any further investigation. Robbins admitted that

24

he realized there was a white residence next door, approximately one hundred feet away, with 343-A clearly marked on the door, but he did not follow his informant's lead to investigate to determine if there was a "white house behind the white house." Photographs presented to the Court show that a white house clearly marked 343-B sits behind a white house marked 343-A, and 343-B is clearly visible from Old Trenton Road.[9]

Still not sure about his own observations or on order of his supervisor, Sgt. Clinard, Robbins sent Wiroll and McClintock to survey the location. They used binoculars to examine the area, they knew that other buildings existed, and they commented to each other about the existence of the other buildings. Despite their concern that the building marked "B" might not be the targeted house, Wiroll and McClintock obtained descriptors only of that residence and reported to Robbins that it was tan with maroon shutters and a maroon-shingled roof.

Based on the parties' stipulation, Robbins knew the citizen informant had told him that Taylor lived in a white house. The color of the house was one of the few facts the informant provided. Yet, Robbins did not disclose this fact to the judge. Further, Robbins' own observation that the house assumed to be 343-B was brown, Norfleet's report that the house assumed to be 343-B was brown, and Wiroll's and McClintock's report that the house assumed to be 343-B was tan, with maroon shutters and a maroon-shingled roof, apparently did not set off any alarms that caused Robbins to question what he was doing. Instead, without further investigation, Robbins described the location according to Wiroll's and McClintock's descriptors and even went a step further to

_____

[9]The parties refer in their supplemental briefs to photographs showing the mailboxes, but such photographs were not presented to the Court for review.

<u>assume</u> that the residence with a "B" at the door was "an apartment complex containing five apartments."

Based on his own assumptions and those of Norfleet, Wiroll and McClintock, Robbins drafted a search warrant and affidavit that incorrectly described the premises intended to be searched and failed to inform the judge that there were white buildings in close proximity, one of which Robbins knew was marked 343-A, and one of which might match the informant's information. The state judge was unaware of the informant's description, and he was further unaware that a reasonable officer investigating the scene would have known that a white residence behind 343-A, marked as 343-B, was visible from Old Trenton Road. Viewing Robbins' affidavit in support of the search warrant in light of the misinformation given to the judge, and the failure to give the judge other relevant information that was material to the issue of probable cause, the Court must conclude that the judge likely would not have issued the warrant for the residence described in the application for lack of probable cause. <u>See</u> <u>Hale v. Kart</u>, 396 F.3d 721, 726 (6th Cir. 2005); <u>Vakilian</u>, 335 F.3d at 517; <u>Neudigate</u>, 101 Fed. Appx. at 53. Thus, a reasonable jury could find on this record that Robbins acted at least with reckless disregard of the truth when he presented his search warrant application to the judge.

Officers Wiroll and McClintock participated in gathering information on which Robbins relied in obtaining the search warrant. They failed to present to Robbins other relevant information about neighboring structures which they observed and which also should have been presented to the judge. As such, reasonable jurors could find that they also acted in reckless disregard of the truth.[10]

_____

[10]Defendant Norfleet moved for summary judgment and Plaintiffs did not contest his motion in their responsive Memorandum. In any event, in light of Norfleet's testimony that he told Robbins he could not swear he had located the correct house, Robbins' response that he would "check it out,"

Each of these officers had a duty, under the facts presented, to discover the existence of 343-B and disclose it to the judge.  See Garrison, 480 U.S. at 85.

Sgt. Clinard was Robbins' direct supervisor.  See Estate of Carter v. City of Detroit, 408 F.3d 305, 314 (6th Cir. 2005); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (noting supervisory liability attaches when supervisor encourages, condones or participates in constitutional violation).  Although there is some dispute as to when Sgt. Clinard reviewed the search warrant application and what the application said at the time he reviewed it, there is no dispute that Clinard knew the substance of the informant's information; therefore, he knew that Taylor lived in a white house.  Yet Clinard approved the search warrant application describing a tan residence with maroon shutters and a maroon-shingled roof.  He did so even though he knew of concern that the house marked "B" might not be the correct house and even after he directed Robbins to send other officers, Wiroll and McClintock, to the location to double-check.  He did so knowing that Robbins had done the bare minimum to corroborate the informant's allegations about drug possession.  Plaintiffs present evidence to support their contention that Clinard allowed Robbins to violate Police Department General Order E-5 XIV(3) by not requiring file documentation and corroboration of the informant and by not asking the District Attorney's Office to review the search warrant application.  In light of these facts, taken most favorably to Plaintiffs, Clinard violated his duty to supervise Robbins to be sure that Robbins discovered and disclosed accurate facts to the judge.  See id.

―――――――――――――――――

and Robbins' own subsequent observation of the property followed by Wiroll's and McClintock's, Plaintiffs have not made a substantial showing that Norfleet stated a deliberate falsehood or showed reckless disregard for the truth to defeat his claim to qualified immunity.  See Vakilian, 335 F.3d at 517.  Consequently, although Norfleet participated in obtaining information for the search warrant, the Court concludes he is entitled to qualified immunity and the Court will grant Defendant Norfleet's motion for summary judgment.

Thus, Officers Robbins, Clinard, Wiroll, and McClintock violated Plaintiffs' clearly established Fourth Amendment rights to be free from an unreasonable search and seizure. See Knott, 418 F.3d at 571 (holding defendants not entitled to qualified immunity because "the constitutional infirmity of the search warrant executed by the Defendants was clearly established at the time they searched"; "The Fourth Amendment obviously forbids relying on a warrant to search one [residence] when all of the [residence]-specific descriptors refer to another [residence][.]") Viewing this case from Plaintiffs' perspective, these officers were "plainly incompetent," see Hunter v. Bryant, 502 U.S. 224, 229 (1991), and they are not entitled to qualified immunity for their conduct in obtaining information in support of the search warrant application.

### 3. Qualified immunity in the execution of the warrant

After the invalid search warrant was obtained, Wiroll drove Sgt. Gipson, the TACT Team commander, to the site to plan for execution of the warrant, yet Gipson did not have a copy of the search warrant with him. En route to the scene Wiroll told Gipson of his concerns about the day. Gipson later acknowledged that the concerns Wiroll raised to him did not give him "warm fuzzies" about the warrant.

At the location, Gipson, like Wiroll previously, viewed the area through binoculars, but he did not question whether the tan house marked with "B" at the door was the correct location, even though the actual 343-B should have been visible from Old Trenton Road, according to the photographs before the Court. Gipson testified that he simply relied on the description in the search warrant (which he had not yet seen), and he did not conduct further independent investigation, even though his conversation with Wiroll prompted him to call Robbins and once again confirm that Robbins was targeting the house marked "B."

28

Thus, before the warrant was executed, Gipson, the TACT Team commander, possessed information that should have raised his suspicion. Based on Wiroll's comments, Gipson had reason to question seriously whether the house marked "B" was actually 343-B and whether the search warrant description was ambiguous. Where an officer recognizes that a search warrant is potentially ambiguous <u>before</u> execution of the warrant, he must immediately stop execution and seek the necessary clarification to ensure that the warrant particularly describes the place to be searched, as required by the Fourth Amendment. <u>Jones v. Wilhelm</u>, 425 F.3d 455, 463 (7th Cir. 2005) (citing <u>Garrison</u> as forbidding execution of search warrant police officer knows to be ambiguous). While Defendants' expert opines that Gipson reasonably relied on the search warrant description, it is the law that the officer in such a situation is not entitled to rely on his own observations to resolve an ambiguity for himself; rather, he must present his knowledge to the judge for determination. <u>Id.</u> (holding information must be submitted to judge even though search warrant had already issued).

Moreover, Gipson is not entitled to rely on the good faith exception of <u>United States v. Leon</u>, 468 U.S. 897, 926 (1984), because he had prior knowledge before executing the warrant that the wrong residence may have been targeted. "[I]f an officer obtains information while executing a warrant that puts him on notice of a risk that he could be targeting the wrong location, then the officer must terminate his search." <u>Jones</u>, 425 F.3d at 464. Thus, Plaintiffs have made a substantial showing that, by going forward despite Wiroll's misgivings, Gipson also showed reckless disregard for the truth to defeat his claim to qualified immunity. <u>See Vakilian</u>, 335 F.3d at 517. Gipson violated Plaintiffs' clearly established Fourth Amendment rights, and he is not entitled to qualified immunity. <u>See Hartsfield v. Lemacks</u>, 50 F.3d 950, 955 (11th Cir. 1995) ("Because Newton did

Case 3:05-cv-00138   Document 135   Filed 02/09/07   Page 29 of 40 PageID #: 1996

nothing to make sure that he was leading the other officers to the correct residence, we conclude that the district court erred in holding that he was protected by qualified immunity.")

Officer O'Dell conducted surveillance at the location while the TACT Team was en route. O'Dell's instructions were simply to watch the house to see if anyone was coming or going before the TACT Team arrived. O'Dell was not privy to the informant's description of a white house. He was not asked to describe the house or plan for the execution of the warrant. He did not notice the residence marked 343-B behind 343-A due to its location and approaching darkness. He knew there were four or five mailboxes, but he recollected that he did not see the mailbox numbers until he parked and walked toward the house to assist the TACT Team at the perimeter of the property during execution of the warrant. Accordingly, the Court determines that Plaintiffs have not carried their burden to show that O'Dell violated their clearly established Fourth Amendment rights and that he is not entitled to qualified immunity. Officer O'Dell acted in an objectively reasonable manner, and Plaintiffs have not made a substantial showing that O'Dell stated a falsehood or acted with reckless disregard of the truth. Thus, he is entitled to qualified immunity. See Vakilian, 335 F.3d at 516.

### 4. *Plaintiffs' withdrawn claims*

In their Memorandum in opposition to the individual Defendants' motion for summary judgment, Plaintiffs withdraw their constitutional claims against all members of the TACT Team except Gipson--that is, Wiroll (as a TACT Team member), Burdine, Knoll (except for the "frisk" claim against him), Crockarell, Smith and Ferguson--because they "reasonably relied on . . . their commander and the investigators who informed them that there was a valid warrant for this address, drove them to the location and told them which door to force entry into." (Docket Entry No. 114,

Case 3:05-cv-00138   Document 135   Filed 02/09/07   Page 30 of 40 PageID #: 1997

Plaintiff's Memorandum at 25.) Plaintiffs also withdraw against the TACT Team Defendants any claims for "unreasonable force used against the Plaintiffs once the Defendants should have reasonably realized they were in the wrong location." (Id.) This appears to include Plaintiffs' state-law claims for assault and battery because Plaintiffs do not address those claims in their Memorandum.

The Court considers these claims withdrawn by the Plaintiffs and the Court will not discuss them. Additionally, Plaintiffs presented no evidence to support an excessive force claim against Robbins. He is entitled to summary judgment on the excessive force claim stated against him in Count IV.

### 5. Officer Knoll's frisk of Elliott

Plaintiff Elliott contends that Officer Knoll exceeded the scope of Terry v. Ohio, 392 U.S. 1 (1968) when he frisked Elliott for weapons and therefore Knoll is not entitled to qualified immunity. The Court cannot agree. See Molina v. Cooper, 325 F.3d 963, 968 (7th Cir. 2003) (noting civil rights plaintiffs bear burden to defeat qualified immunity defense).

Prior to the search, the TACT Team members, including Knoll, were informed they would be executing a narcotics warrant, which is considered to be high-risk because of the potential for weapons presence and use. As Plaintiffs now concede, the TACT Team members relied on their commander, Gipson, and believed that they were, in fact, executing a valid narcotics search warrant.

When Burdine entered the Plaintiffs' residence, he saw Elliott standing at the back of the room in a doorway with a black object in his hands. Elliott thought he might have been carrying a television remote control. The record before the Court does not reveal for certain what this object was or what happened to it. Under the circumstances, however, Burdine was prudent to question

31

whether Elliott might be carrying a weapon. See United States v. Bearden, No. 05-6595, 2007 WL 79012 at *4 (6th Cir. Jan. 9, 2007) (unpublished) (under Michigan v. Summers, 452 U.S. 692 (1981), court should assess character of official intrusion and its justification, balance of law enforcement interests with intrusion on person, and determine whether officers had articulable and individualized suspicion to conduct search).

Burdine engaged the Plaintiff, directed him face-down to the floor and started to handcuff him for officer security. Elliott admits he resisted. Burdine called for cover. Knoll approached to assist Burdine. Elliott continued to resist until the flexicuffs were placed. The officers then lifted Elliott up and Knoll frisked his waistband and back for any weapons. Elliott was then placed face down on the floor. Knoll testified that he did not have any specific reason to think that Elliott was armed or dangerous, but he was not the first officer to see Elliott and engage him; Burdine was, and Burdine saw a black object in Elliott's hands. Knoll assisted Burdine in flexicuffing Elliott. Even taking the facts in the light most favorable to Elliott, neither Knoll nor Burdine knew whether Elliott had a weapon, and Knoll was aware of other situations in which individuals were able to reach weapons even when handcuffed. (Knoll Depo. at 56-57.) Knoll frisked Elliott to ensure officer safety. He testified "you would be foolish not to check an individual and make sure they [didn't have] guns."[11] (Id. at 57.)

_____

[11]It appears that Plaintiffs' expert claims Knoll conducted an illegal search of Elliott only because Knoll used the word "search" instead of "frisk" when describing the event during his deposition. All of the evidence points to a conclusion that Knoll frisked Elliott for weapons and did not engage in any type of invasive search. Plaintiffs' expert admitted that he mistakenly thought Knoll put his hand in Elliott's pocket, but there was no evidence that any such thing occurred, and Elliott was wearing only gym shorts.

32

Under Summers, 452 U.S. at 705, the TACT Team members had a limited authority to detain occupants of the premises to minimize the risk of harm to the officers in anticipation of a proper search. See Burchett v. Kiefer, 310 F.3d 937, 942-943 (6th Cir. 2002); United States v. Bohannon, 225 F.3d 615, 616 (6th Cir. 2000). "[I]t would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances." Bohannon, 225 F.3d at 616. Even though, unbeknownst to Knoll, he was in the wrong residence, his reasonable mistake did not eliminate the reasonable suspicion necessary to justify a seizure and frisk under Terry. See Bearden, 2007 WL 79012 at **4-5.

The Supreme Court case of Ybarra v. Illinois, 444 U.S. 85 (1979), cited by Plaintiffs, does not change the outcome here. Even that case recognized that the predicate to a patdown of a person for weapons is a reasonable belief that the person may be armed and presently dangerous. Id. at 92-93; United States v. Bell, 762 F.2d 495, 499 (6th Cir. 1985). Moreover, the Sixth Circuit explained in Bell that "Ybarra teaches that 'mere propinquity, without more,' does not give rise to probable cause to search." Id. at 499 n.4. In Ybarra, the individual who was frisked did not make any gestures indicative of criminal conduct, and acted generally in a non-threatening manner. Id. Here, a drug search warrant was being executed, Elliott appeared with a black object in his hand, and he resisted the officers' attempts to handcuff him. Officer Knoll acted in an objectively reasonable manner in conducting a brief frisk of Elliott for weapons. Accordingly, Officer Knoll is entitled to qualified immunity on this claim.

### 6. Summary

The motion for summary judgment of individual Defendants Robbins, Clinard, Wiroll, McClintock and Gipson on Plaintiffs' claims for illegal search and seizure in Count II of the

Amended Complaint will be denied. The motion for summary judgment of individual Defendants Norfleet, O'Dell, Burdine, Knoll, Crockarell, Smith, and Ferguson on Plaintiffs' claims for illegal search and seizure in Count II will be granted.

Officer Knoll's motion for summary judgment on Plaintiff Elliott's claim for illegal search and seizure as a result of the frisk will be granted. This will result in the dismissal of Count III of the Amended Complaint.

Summary judgment in favor of all of the TACT Team Defendants--Gipson, Wiroll, Burdine, Knoll, Crockarell, Smith and Ferguson–and in favor of Robbins will be granted on the claims for excessive force and assault and battery. This will result in the dismissal of Counts IV and V of the Amended Complaint.

## B. Liability of the City and Chief Smith

Plaintiffs alleged in Count I of their Amended Complaint a claim that Defendant Chief Mark Smith acted with deliberate indifference by

> making the conscious decision not to require "confidential informants" to point out the target to be searched to an agent or affiant swearing out a search warrant and not to require that the police obtain actual independent corroboration of information provided by "confidential informants" seeking payment or benefits in exchange for information.

(Docket Entry No. 13, Amended Complaint ¶ 30.) Plaintiffs further alleged that the "failure of Chief Smith's approved policy to require informants to adequately describe or physically point out the target to be searched was a direct and proximate cause of the injuries and damages sustained by Plaintiffs Elliott and Guiler in violation of their constitutional right to be free from unwarranted search and seizure." (Id. ¶ 31.) Plaintiffs further alleged that "Chief Smith's decision to allow the police under his command to obtain and execute search warrants based on information provided by

'confidential informants' without requiring independent corroboration was a direct and proximate cause of the injuries and damages sustained" by Plaintiffs.  (Id. ¶ 32.)  Plaintiffs alleged that "Chief Smith authorized and approved a practice of officers testifying by affidavit in order to obtain search warrants that they had information from 'confidential informants' when in fact all they had was information from a person or persons that they knew habitually associated with drug dealers."  (Id. ¶ 33.)  Finally, "[t]hese specific acts, and others, of Chief Mark Smith constitute deliberate indifference to the constitutional rights of Plaintiffs . . . and were under color of state law[.]"  (Id. ¶ 34.)

Plaintiffs learned during discovery that a citizen informant was involved in this case, but at no time during the litigation did Plaintiffs move for leave to amend their allegations.  The Amended Complaint is the pleading which controls the claims made in this case.

Defendants City of Clarksville ("the City") and Chief Smith moved for summary judgment on the allegations pleaded in Count I, and for all of the reasons stated in their Memorandum of Law (Docket Entry No. 108 at 7-15), which the Court incorporates herein by reference, the City and Chief Smith are entitled to summary judgment on Count I as pleaded.

Inexplicably, in response to the City's and Chief Smith's motion for summary judgment, Plaintiffs do not discuss the allegations made in the Amended Complaint.  Rather, Plaintiffs now contend that the City and Chief Smith "are liable to the Plaintiffs for adopting a custom or policy of failing to train Clarksville Police Department officers and supervisors on departmental policies that are constitutionally significant, and such failure to train led directly to the violation of Plaintiffs' constitutional rights."  (Docket Entry No. 117, Memorandum at 6.)  Plaintiffs make elaborate arguments that the City and Chief Smith failed to train officers and supervisors on the policies

concerning the use of informants and the drafting of search warrants. They also contend that the City and Chief Smith endorsed or ratified Defendants' conduct because an internal disciplinary action against Agent Robbins concluded that no General Orders of the Police Department had been violated and no discipline was required.

Plaintiffs obviously recognized that their Amended Complaint did not plead these failure-to-train and ratification claims because Plaintiffs devote two and one-half pages of their Memorandum attempting to convince the Court that the claims were pled. (Id. at 17-20.) Defendants filed a reply brief responding to the merits of the failure-to-train and ratification arguments, and the parties discuss in their supplemental briefs the positions of their respective experts on these issues.

Despite liberal pleading rules, the Court finds that Plaintiffs failed to plead in Count I of the Amended Complaint claims against the City and Chief Smith for failure to train police officers in the use of informants and drafting search warrants. Plaintiffs also did not plead a ratification claim. By addressing these claims on the merits, however, Defendants have waived any objections they may have had, and in any event the pleadings could be amended to conform to the evidence.

Plaintiffs rely heavily on Gregory v. City of Louisville, 444 F.3d 725, 752-754 (6th Cir. 2006). Gregory cites the well-known case of City of Canton v. Harris, 489 U.S. 378, 388 (1989), to explain that "courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability." Id. at 753. Under the Harris standard, Plaintiffs can survive summary judgment by showing that officer training failed to address the use of informants and drafting of search warrants and that "such a failure has the 'highly predictable consequence' of constitutional violations of the sort Plaintiff[s] suffered." Id. (quoted case omitted). In Gregory, the plaintiff presented two forms of evidence to support his failure to train claim: (1) expert

testimony that necessary training was nonexistent and (2) deposition and inferential evidence that police officers generally did not receive any instruction in the specified areas. Id. at 753-754. On such a record, the Sixth Circuit held that the plaintiff had presented sufficient evidence to survive summary judgment. Id. at 754.

Here, both parties present expert testimony in support of, or in opposition to, the contentions that the City and Chief Smith acted with deliberate indifference when they failed to train officers on Police Department General Orders and allowed officers to ignore General Orders.[12] Based on the disparate positions of the expert witnesses, the Court concludes that genuine issues of material fact exist for trial, and the City and Chief Smith are not entitled to summary judgment on the failure-to-train claim.

In so holding, the Court notes that "[d]eliberate indifference" is "'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" Stemler v. City of Florence, 126 F.3d 856, 865 (6th Cir. 1997). "[T]he risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" Id. Plaintiffs have produced barely sufficient evidence to survive summary judgment to show that the training programs may have been inadequate, and that the City and Chief Smith "did not take proper steps to ensure that their officers knew and complied with their policies." Id. On this record, Plaintiffs have not produced any evidence, however, "that the municipality was

---

[12]Furthermore, Plaintiffs cite deposition testimony of Chief Smith and officers Robbins, Clinard, McClintock, Smith, Wiroll, and O'Dell in support of their claim that General Orders are not followed. (Memorandum at 9-14, 16-17.) To the Court's knowledge, these deposition excerpts were not included in the summary judgment record. The Court cannot consider evidence that is not properly placed before it. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 325. However, other references to such testimony are made in the experts' discussions of the failure-to-train issues.

aware of prior unconstitutional actions of its employees and failed to respond." <u>Id.</u> at 865. As to this latter point, Defendants present the testimony of Chief Smith and Sgt. Gipson that this incident marked the first time something like this had happened in Clarksville. (Docket Entry No. 107-8, Chief Smith Depo. at 93; Docket Entry No. 107-9, Gipson Depo at 71.) Thus, Plaintiffs may proceed to trial on these claims, but the Court's holding on summary judgment does not give any indication of how the Court might rule on a motion for judgment as a matter of law based on the trial evidence before the Court at that time.

As far as the ratification theory is concerned, Plaintiffs have not presented the Court with sufficient evidence to show that a jury question exists. Plaintiffs have not shown that there was a complete failure to investigate Plaintiffs' complaint against the involved officers and that similar conduct had occurred frequently in the past and the City and Chief Smith did nothing to stop it. <u>See Leach v. Shelby County Sheriff</u>, 891 F.2d 1241 (6th Cir. 1989); <u>Marchese v. Lucas</u>, 758 F.2d 181 (6th Cir. 1985). Chief Smith did conduct a disciplinary investigation of Agent Robbins, (Docket Entry No. 117-8); it appears, however, that Plaintiffs disagree with the result and Chief Smith's conclusion that no discipline was warranted. (Docket Entry No. 117-4.) Once an individual's constitutional rights have been violated, however, "a subsequent failure to conduct a meaningful investigation cannot logically be the 'moving force' behind the alleged constitutional deprivation." <u>Daniels v. City of Columbus</u>, 2002 WL 484622 at **5-7 (S.D. Ohio 2002); <u>Alexander v. Beale Street Blues Co.</u>, 108 F.Supp.2d 934, 949 (W.D. Tenn. 1999); <u>Fox v. VanOosterum</u>, 987 F.Supp. 597, 604 (W.D. Mich. 1997). For this reason, the City and Chief Smith are entitled to summary judgment on Plaintiffs' ratification claim.

Case 3:05-cv-00138   Document 135   Filed 02/09/07   Page 38 of 40 PageID #: 2005

aware of prior unconstitutional actions of its employees and failed to respond." <u>Id.</u> at 865. As to this latter point, Defendants present the testimony of Chief Smith and Sgt. Gipson that this incident marked the first time something like this had happened in Clarksville. (Docket Entry No. 107-8, Chief Smith Depo. at 93; Docket Entry No. 107-9, Gipson Depo at 71.) Thus, Plaintiffs may proceed to trial on these claims, but the Court's holding on summary judgment does not give any indication of how the Court might rule on a motion for judgment as a matter of law based on the trial evidence before the Court at that time.

As far as the ratification theory is concerned, Plaintiffs have not presented the Court with sufficient evidence to show that a jury question exists. Plaintiffs have not shown that there was a complete failure to investigate Plaintiffs' complaint against the involved officers and that similar conduct had occurred frequently in the past and the City and Chief Smith did nothing to stop it. <u>See Leach v. Shelby County Sheriff</u>, 891 F.2d 1241 (6th Cir. 1989); <u>Marchese v. Lucas</u>, 758 F.2d 181 (6th Cir. 1985). Chief Smith did conduct a disciplinary investigation of Agent Robbins, (Docket Entry No. 117-8); it appears, however, that Plaintiffs disagree with the result and Chief Smith's conclusion that no discipline was warranted. (Docket Entry No. 117-4.) Once an individual's constitutional rights have been violated, however, "a subsequent failure to conduct a meaningful investigation cannot logically be the 'moving force' behind the alleged constitutional deprivation." <u>Daniels v. City of Columbus</u>, 2002 WL 484622 at **5-7 (S.D. Ohio 2002); <u>Alexander v. Beale Street Blues Co.</u>, 108 F.Supp.2d 934, 949 (W.D. Tenn. 1999); <u>Fox v. VanOosterum</u>, 987 F.Supp. 597, 604 (W.D. Mich. 1997). For this reason, the City and Chief Smith are entitled to summary judgment on Plaintiffs' ratification claim.

Case 3:05-cv-00138   Document 135   Filed 02/09/07   Page 38 of 40 PageID #: 2005

**E. Defendants' Motion to Strike**

Defendants ask the Court to strike the facts outlined in Plaintiffs' Memoranda filed in opposition to the Defendants' summary judgment motions on the ground that Plaintiffs failed to set forth separate statements of additional material facts in dispute pursuant to Local Rule 56.01(c). In response, Plaintiffs state that they identified all material facts in dispute in their responses to Defendants' statements of undisputed facts, and any additional facts contained in their Memoranda were for the purpose of context only.

The Court has reviewed the entire summary judgment record. Even if Plaintiffs violated Local Rule 56.01(c), and the Court is not convinced that they did, the Court still retains discretion to consider all facts presented by the parties, as well as any other facts apparent in the record that were not even addressed by the parties. Accordingly, Defendants' Motion to Strike will be denied.

## IV. <u>CONCLUSION</u>

The search warrant obtained in this case was invalid as a matter of law, and Plaintiffs are entitled to summary judgment on that issue.

Plaintiffs failed to amend Count I of their Amended Complaint to state the claims they now pursue against the City and Chief Smith, but even so, they will be permitted to proceed to trial against the City and Chief Smith on their claim for failure to train. Plaintiffs will not be permitted to proceed against the City and Chief Smith on a ratification theory. Thus, the City's and Chief Smith's motion for summary judgment will be granted in part and denied in part.

The individual Defendants' motion for summary judgment also will be granted in part and denied in part. Defendants Robbins, Clinard, Wiroll, McClintock and Gipson are not entitled to qualified immunity and thus they are not entitled to summary judgment on Plaintiffs' claims for

illegal search and seizure stated in Count II of the Amended Complaint, and their motion will be denied. The motion for summary judgment of individual Defendants Norfleet, O'Dell, Burdine, Knoll, Crockarell, Smith, and Ferguson on Plaintiffs' claims for illegal search and seizure in Count II will be granted, as Plaintiffs have either withdrawn the claims or the Defendants are entitled to qualified immunity. Additionally, Officer Knoll's motion for summary judgment on Plaintiff Elliott's claim for illegal search and seizure as a result of the frisk will be granted, resulting in dismissal of Count III of the Amended Complaint.

Summary judgment in favor of all of the TACT Team Defendants--Gipson, Wiroll, Burdine, Knoll, Crockarell, Smith and Ferguson–and Robbins will be granted on the claims for excessive force and assault and battery. This will result in the dismissal of Counts IV and V of the Amended Complaint.

Defendants Norfleet, O'Dell, Burdine, Knoll, Crockarell, Smith, and Ferguson will be dismissed from the suit with prejudice.

Remaining for trial are Plaintiffs' Fourth Amendment claims for illegal search and seizure stated in Count II against Agent Robbins, Sgt. Clinard, Sgt. Gipson, and officers Wiroll and McClintock, and Plaintiff's new failure to train claim brought against the City and Chief Smith.

An appropriate Order shall be entered.


ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

40